TATE, Judge
(concurring).
I have no difficulty agreeing with any part of the majority opinion, except its conclusion that International Paper Company, one of the defendants, is not liable in workmen’s compensation as a statutory principal under LSA-R.S. 23 :1061.
Under this statutory provision, when a principal contracts out to subcontractors any of the work which is part of the principal’s trade, business, or occupation, then such principal shall be liable in workmen’s compensation to the contractor’s employees injured while in the execution of such work. The purpose of this statutory liability is to prevent a principal engaged in a hazardous business from contracting out his work in order to evade the principal’s liability for workmen’s compensation benefits to employees utilized in such work. See Malone, Louisiana Workmen’s compensation, 1951. Chapter 6, page 140.
In the present case, International Paper contends it is not a principal contracting out part of its work. The majority has sustained this defense on the ground that the evidence shows that International sold its own standing timber to one of its dealers and then merely repurchased same after the dealer had processed the timber into pulpwood.
On the basis of the limited evidence in the record, I cannot say that the majority commits error in holding that these transactions were in reality bona fide sales, and that International had absolutely no control over the harvesting of the timber, so that therefore its sale and the re-purchase of its own timber were only open market transactions. I will therefore concur.
The conclusion that International was not contracting out part of its work is possibly supported by the jurisprudence. However, it seems to me to be supported by a kind of Alice in Wonderland reasoning for an imaginary world.
From any commonsense point of view, International actually paid Mullins & Parker for the services of Mullins & Parker in harvesting International’s timber and delivering it at the railhead cut into pulpwood for International’s use; even though on paper Mullins & Parker was an alleged “purchaser” from and then a re-“seller” to International of the same International timber.
International had several large paper mills requiring enormous amounts of pulpwood to be delivered weekly. To assure an adequate supply, International not only purchased pulpwood on the local market, but it also maintained extensive acreages on which it grew its own timber for the express purpose of manufacturing it into pulpwood.
In the present case, for example, International grew pulpwood on 145,000 acres of land in the five-parish area with which we are concerned. International’s tracts supplied approximately 50% of the pulpwood used by International from this five-parish area.
To harvest its own pulpwood, International did not directly hire the crews who cut and delivered the timber as pulpwood. No, it “sold” the timber on each tract in bulk to one of five dealers, each of whom had standing arrangements to supply International by means of weekly purchase orders of pulpwood, by reason of which these dealers’ entire economic activities were directed towards procuring pulpwood for International as directed by it by these weekly purchase orders. The dealers were given “title” to only those trees on each tract which had been previously marked by paint as selected by International’s foresters as suitable for pulpwood harvesting at that time. (It is immaterial to the present question that, since undesired by International, insignificant amounts of non-pulpwood products were sold to other plants, instead of being wasted or burned.)
• After Mullins & Parker “bought” International’s timber from International, this partnership may have been “free” to sell the timber cut into pulpwood to one of In *565 ternational’s competitors. However, it does not take the eye of a prophet to predict that the profitable connection of Mullins & Parker with International, existing for some twelve years, would soon thereafter have been terminated; and Mullins & Parker would then be out in the cold, cruel world, instead of existing as a well-paid service organization for International, with the responsibility of directing the producing and delivery of pulpwood to International’s plants as requested by International’s weekly purchase orders.
As a matter of fact, the evidence indicates that, while a Mullins & Parker partner believed he could have diverted International’s pulpwood to another market, he also admitted that as a matter of fact he never had. Tr. 128; see also Tr. 120.
Realistically viewed, International Paper was not growing pulpwood timber on hundreds and hundreds of thousand of acres, attended by foresters and with scientific care, for the purpose of furnishing pulpwood to International’s competitors. Undoubtedly, the sole purpose of growing these extensive acreage of pulpwood timber was in order to supply International’s paper plants with the amounts of pulpwood needed by it for the manufacture of paper.
From any realistic sense, International was not “selling” its timber on the open market and then re-“purchasing” it after it was cut into pulpwood. These transactions by International were with its select few dealers, tied into International’s operations by a longstanding and continuous relationship, which International could terminate at will. Although on paper the dealers may have seemed free to dispose of International’s timber, the dealers were in fact only another branch of International’s operations. What International was really paying these dealers for, by the differential between the “selling” and ‘buying” price of the same timber, was for the dealer’s services in having the timber cut, processed into pulpwood, and delivered to International.
Because on the surface of the paper relationship, the dealers were theoretically bona fide purchasers from and re-sellers to International of International’s timber, we are holding International was not a principal contracting out a part of its business. In reality, although the paper transactions are slightly dissimilar, International had exactly the same control and was contracting out the harvesting of its pulpwood in the exactly same manner as were the defendant paper mills held liable in workmen’s compensation to pulpwood producers of timber on paper mill acreages in Redding v. Cade, La.App. 3 Cir., 158 So.2d 880, certiorari denied, and in Hatten v. Olin Mathieson Corp., La.App. 2 Cir., 112 So.2d 135, certiorari denied.
In the Stevens, Jones, and Kline cases cited by the majority, our state Supreme Court has shown an increasingly realistic view that the ultimate recipient of timber products may be responsible in compensation to those injured in harvesting it, where in fact the timber harvesting operations were conducted with the sole aim of supplying the “buyer” (only) with the timber in question, and where in fact the timber harvesting operations were economically controlled by the ultimate “buyer”.
Just as in those decisions the true principal was prevented from shielding himself from compensation liability by what on paper were buyer-seller relationships, so in the present case the Supreme Court may wish to re-examine prior jurisprudence and to hold that, within the meaning of the compensation act, International Paper is a principal herein liable in compensation to the workman injured in producing pulpwood for International’s account, irrespective of whether the paper arrangements between International and its puppets could for some purposes be characterized as bona fide sales. As Professor Wex Malone, the eminent authority on Louisiana workmen’s compensation, has stated in the most recent supplement to his authoritative work: “Apparently it is assumed that a person can *566 not be a 'seller’ and a ‘contractor’ at the same time, although this writer has never understood why both these relationships cannot exist simultaneously.” Louisiana Workmen’s Compensation (1951), 1964 Pocket Part, Section 123, at p. 47.